UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ARTIS MALCOLM CRENSHAW,<br><br>Defendant. | Case No. 20-cr-00015-JD-1<br><br>**ORDER RE MOTION TO SUPPRESS**<br>Re: Dkt. No. 34 |

Defendant Artis Malcolm Crenshaw is charged with violating 18 U.S.C. § 922(g), felon in possession of a firearm and ammunition. Dkt. No. 1. He moves to suppress evidence obtained during a traffic stop of a car in which he was a passenger. Dkt. No. 34. The record is straightforward and well-documented, and the Court has resolved the motion solely on the basis of undisputed facts. The motion is denied.

**BACKGROUND**

At approximately 5:35 p.m. on December 12, 2019, Concord Police Department (CPD) officers Roberts and Alvarado were on patrol duty in a marked police vehicle in Antioch, California. *See* Dkt. No. 42 ¶ 4 (Alvarado Declaration); Dkt. No. 43 ¶ 4 (Roberts Declaration).[1] The officers were in Antioch as part of a "Vehicle Theft Suppression Enforcement Team" (V-SET) for Contra Costa County. Dkt. No. 43 ¶ 3. V-SET is a multi-agency law enforcement task force staffed by patrol officers from participating departments such as the CPD, the Antioch Police Department, the Contra Costa Sheriff Department, and several others, who conduct anti-car theft

---

[1] The facts are pieced together from body cam videos that were not transcribed, *see* Dkt. No. 34-2, Exhs. D & E, and evidentiary declarations. The declarations frequently describe events that are also shown in the videos, and the citations to them are not meant to displace or slight the video evidence in any way. The facts recounted here are not materially disputed.

1  operations throughout the county on a rotating assignment basis. *Id*. In December 2019, the V-
2  SET team was assigned to Antioch. *Id*.

3        Officers Alvarado and Roberts spotted a car in the process of parking at a store. *Id*. ¶ 5.
4  This was in the area of E. 18th Street in Antioch. *Id*. ¶ 4. The officers had been advised in a V-
5  SET briefing that this area was known to the Antioch police as being associated with stolen
6  vehicles and other criminal problems. *Id*.

7        The officers ran a check on the vehicle's registration and determined that it was expired.
8  *Id*. ¶ 5. After the car pulled out of the lot and was driving down a street, the officers pulled it over
9  for the registration violation. *Id*.

10       Officer Alvarado walked to the driver side of the car, and Officer Roberts went to the
11 passenger side. *Id*. ¶ 6. CPD Sergeant Sansen arrived on the scene, and also went to the passenger
12 side. Officer Roberts' and Sergeant Sansen's body cameras were on during the ensuing events,
13 *see* Dkt. No. 34-2, Exhs. D & E; Officer Alvarado's camera was not activated, *see* Dkt. No. 42 ¶ 8.

14       Three individuals were inside the car. Crenshaw was seated in the back, and the driver and
15 a female passenger were seated up front. Officer Alvarado asked the driver for his license and
16 registration. Dkt. No. 42 ¶ 6. The driver shuffled through some papers and said he didn't have a
17 license. *Id.* He looked through more papers to find a registration. *Id.* While Officer Alvarado
18 was speaking with the driver, Officer Roberts got an identification from the female passenger in
19 the front seat. Dkt. No. 43 ¶ 6. He asked Crenshaw for his identification and whether he was on
20 probation or parole. *Id*. Officer Roberts did this pursuant to his training for officer safety. *Id*.
21 Crenshaw promptly provided his name and birthdate, and said he was on probation for a drug-
22 related conviction. *Id*. Crenshaw did not object in any way to Officer Roberts' questions.

23       Officer Roberts called dispatch for a records check on Crenshaw and the other passenger.
24 A dispatch officer advised that Crenshaw was on post-release community supervision (PRCS).
25 The records check took approximately 95 seconds to complete. *Id.* ¶ 6. Officer Roberts talked
26 with the passengers at the same time that Officer Alvarado discussed the registration issue with the
27 driver. Dkt. No. 42 ¶ 7; Dkt. No. 43 ¶ 6.

28

At this point, the relatively calm tenor of the interaction changed.  Officer Roberts understood Crenshaw's PRCS status to mean he was subject to a search, and the officer opened the rear passenger door to ask Crenshaw to step out. Dkt. No. 43 ¶ 7.  Crenshaw hesitated and made a gesture of reaching behind his back.  This alarmed Officer Roberts, who feared Crenshaw might be going for a weapon. *Id*.  He grabbed Crenshaw's arm and asked what he was doing.  Crenshaw pulled his arm away and told Officer Roberts not to grab him. *Id*.  Officer Roberts repeated the command to get out of the car. *Id.*  After Crenshaw complied, he spun around abruptly to face Officer Roberts. *Id*. ¶ 8.  This again caused a safety concern, and Officer Roberts and Sgt. Sansen grabbed Crenshaw, who tried to pull away. *Id*.  The officers swept Crenshaw's legs out from under him, and brought him to the pavement. *Id*.  A brief scuffle ensued until the officers were able to handcuff Crenshaw.  Officer Roberts patted Crenshaw down, and found in his jacket pocket a 9mm semi-automatic handgun, a loaded 9 mm magazine, and a black bag containing six unexpended 9 mm rounds. *Id*. ¶ 9.  Crenshaw sustained a minor cut and some abrasions on his face from the take-down, and Officer Roberts sustained a one-inch laceration on his elbow. *Id*. ¶ 8.

Crenshaw was forbidden to have a firearm or ammunition under the terms of his PRCS. *See* Cal. Penal Code § 3453(m).  He was indicted for being a felon in possession of a handgun in violation of 18 U.S.C. § 922(g)(1) in January 2020.  Dkt. No. 1.

## DISCUSSION

Crenshaw raises a variety of challenges to the stop and subsequent search.  Most of them are readily decided against suppression.  Crenshaw says that the CPD officers were not authorized to conduct law enforcement activities in Antioch because it was outside of their "precinct."  Dkt. No. 34 at 5.  For this proposition, Crenshaw cites *United States v. Cooley*, 919 F.3d 1135 (9th Cir. 2019), which reviewed an Indian tribe's authority to enforce criminal laws on tribal lands.  The questions of Indian sovereignty and tribal law discussed in *Cooley* have nothing at all to do with the traffic stop and search here, and the case provides no support for an out-of-precinct theory.

The record also weighs against Crenshaw on this issue.  The CPD officers were on patrol in Antioch under the multi-agency V-SET program to combat car theft throughout Contra Costa

3

County. They were properly on duty in Antioch. *See also* Cal. Penal Code § 830.1(a)(2) (extending municipal police officers' authority to any county where they have "prior consent" to operate). Crenshaw does not meaningfully dispute this, and says only that the government should have produced a "signed consent by the Antioch Police Department." Dkt. No. 45 at 8. Why that is so is not explained. In any event, the evidence adduced by the government is enough to establish the propriety of the CPD officers' presence in Antioch.

Crenshaw's suggestion the officers should have used a "less intrusive" means of proceeding, such as ticketing the car while it was parked rather than stopping it later, is of no moment. The Supreme Court has "repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment." *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 763 (2010) (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 663 (1995)). To hold otherwise "could raise insuperable barriers to the exercise of virtually all search-and-seizure powers because judges engaged in *post hoc* evaluations of government conduct can almost always imagine some alternative means by which the objectives of the government might have been accomplished." *Id.* (internal citations and quotations omitted). In addition, a car stop along the lines of what happened here is a well-established method of responding to a traffic violation. *See, e.g., United States v. Willis*, 431 F.3d 709, 714-15 (9th Cir. 2005).

The physical scuffle that occurred also does not invalidate the search and seizure. To be sure, "excessive use of force can render a search unreasonable." *United States v. Ankeny*, 502 F.3d 829, 836 (9th Cir. 2007). But the key concept is "excessive," meaning that the search was conducted with "intolerable intensity." *United States v. Becker*, 929 F.2d 442, 446 (9th Cir. 1991). The take-down of Crenshaw was conducted with minimal physical force, without the use of weapons or devices, and was over within seconds. It was done in response to movements by Crenshaw that reasonably prompted concerns about officer safety. These circumstances do not warrant suppression for intolerable conduct. *See Graham v. Connor*, 490 U.S. 386, 396-97 (1989); *Ankeny*, 502 F.3d at 833 & n.1.

For good reason, Crenshaw does not contend that the officers lacked probable cause to stop the car. Officers may stop a car when they have "at least reasonable suspicion" of a traffic

violation. *Willis*, 431 F.3d at 714. "A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). The CPD officers did a visual check of the car and confirmed with dispatch that it was not legally registered, and so was being operated in violation of California law. *See* Cal. Veh. Code § 4000(a). Consequently, it was lawful for the officers to stop the car for investigation.

Crenshaw's remaining argument for suppression is that stop was "unconstitutionally prolonged." Dkt. No. 34 at 7-8. Crenshaw says that the officers "unreasonably extended" the stop by asking about identification, parole status, and the like. *Id*. at 7. Crenshaw does not dispute that approximately 5 minutes elapsed from the initial stop to the dispatch report of his PRCS status. This is the salient period when the traffic violation was being discussed with the driver, and before Officer Roberts knew that Crenshaw was subject to a suspicionless search by virtue of his PRCS status. Approximately 8 minutes elapsed from the beginning of the stop to the discovery of the firearm and ammunition.

For the undue duration challenge, Crenshaw relies on *Rodriguez v. United States*, 575 U.S. 348 (2015), and two cases applying it in our circuit, *United States v. Landeros*, 913 F.3d 862 (9th Cir. 2019), and *United States v. Evans*, 786 F.3d 779 (9th Cir. 2015). *Rodriguez* involved a stop for a traffic infraction that was prolonged to do a dog sniff for drugs after the traffic violation had been resolved with a written warning. *See Rodriguez*, 575 U.S. at 351-53. The Supreme Court concluded that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id*. at 350. *Landeros* applied *Rodriguez* to conclude that an officer could not prolong a stop after resolving a speeding violation to press a passenger to identify himself. *Landeros*, 913 F.3d at 864. In *Evans*, the circuit court determined that *Rodriguez* barred an officer from prolonging a traffic stop to do an ex-felon registration check and a dog sniff for drugs after telling the driver he wouldn't get a ticket. *Evans*, 786 F.3d at 783, 786.

All three cases turned on the principle that a stop to investigate a traffic infraction may last no longer than is necessary to effectuate that purpose, and attend to the officer's safety. *See*

5

*Rodriguez*, 575 U.S. at 354; *Landeros*, 913 F.3d at 866; *Evans*, 786 F.3d at 785-86.  Authority for the seizure ends when the tasks related to the traffic infraction have been completed, or reasonably should have been completed.  *Rodriguez*, 575 U.S. at 354.  A stop may be prolonged after that point to investigate other conduct, but only if further detention is supported by reasonable suspicion of a crime independent of the basis for the stop.  *See id*. at 357-58; *Landeros*, 913 F.3d at 866; *Evans*, 786 F.3d at 788.

Consequently, the key question for the Fourth Amendment challenge here is whether the CPD officers improperly prolonged the stop after the registration issue had been resolved to conduct an unrelated investigation of Crenshaw.  They did not.  Officer Roberts asked Crenshaw for his identification and about his probation status, which took about one minute to do, at the same time that Officer Alvarado was talking with the driver and waiting for him to produce a valid registration.  Nothing in the record indicates that this simultaneous interaction prolonged the traffic stop in any way, or that the CPD started interacting with Crenshaw only after the traffic stop had been resolved.  It is also worth noting that Officer Roberts did not "demand" Crenshaw's identification, but simply asked for it, which further distinguishes *Landeros*.  *See Landeros*, 913 F.3d at 870 (noting this distinction); *see also United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007) (officers may "ask people who have legitimately been stopped for identification").  Crenshaw identified himself and advised the officer of his post-conviction status without objection.  All of these circumstances are materially different from those in *Rodriguez* and related cases, and so there is no basis for suppression on the grounds of unlawful prolongation.

Officer Roberts' discussion with dispatch does not change this conclusion.  Crenshaw says that Officer Alvarado can be heard talking with dispatch after Officer Roberts did.  Although not entirely clear in Crenshaw's briefs, the point appears to be that consecutive conversations with dispatch might have improperly prolonged the traffic stop.  The problem for Crenshaw is that the dispatch audio recording demonstrates that the officers were speaking with two different dispatchers.  *See* Dkt. No. 45-2, Exh. G.  Officer Roberts did not take up dispatch time or resources that Officer Alvarado could have used to complete the traffic stop.

Crenshaw glosses over these facts to suggest that the officers were strictly limited to talking with the driver about the registration problem, and should not have asked the passengers questions at any time. But *Rodriguez* plainly held that officers may pursue "unrelated checks" during a traffic stop so long as they "do not measurably extend the duration of the stop." *Id*. (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). For example, the officers in *Rodriguez* asked the passenger for his identification, questioned him about the reasons for being in the car, and ran a records check on him after doing the same for the driver. *Id*. at 351. The Supreme Court had no problem with this conduct because it did not unreasonably extend the stop beyond the bounds of the traffic violation. *Rodriguez* cited several other decisions that reached the same conclusion. *See, e.g., Arizona*, 555 U.S. at 333 ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter" into an unlawful seizure "so long as those inquiries do not measurable extend the duration of the stop"); *Muehler v. Mena*, 544 U.S. 93, 101 (2005) (questioning detainee about immigration status during gang-related investigation permissible because it did not extend duration of detention); *Illinois v. Caballes*, 543 U.S. 405, 407-08 (2005) (dog sniff for drugs during traffic stop permissible because it did not extend length of stop).

Crenshaw's effort to read *Landeros* and *Evans* differently is misdirected. *See, e.g.*, Dkt. No. 45 at 1. He plucks a snippet from *Landeros* to say that asking for passenger identification is not within the scope of a traffic stop, and one from *Evans* to similar effect for an ex-felon registration check. *See Landeros*, 913 F.3d at 868; *Evans*, 786 F.3d at 786. This fails to see the forest for the trees. The context of both cases was the prolongation of a stop after a traffic infraction had been resolved to pursue additional investigations. Here, Crenshaw was questioned during the registration investigation, and the questions put to him had no measurable effect on the duration of the stop.

Crenshaw made a cursory suggestion for the first time in a reply brief that the stop was unlawfully prolonged because Officer Alvarado asked for a probation check on the driver. Dkt. No. 45 at 2. Why Crenshaw did not raise this in his main brief is not clear, and the Court would be well within bounds to disregard it as untimely. *See United States v. Bentson*, 947 F.2d 1353,

7

1356 (9th Cir. 1991). Even so, the point is not well taken. Running a record and warrants check on the driver of a car is perfectly legitimate in a traffic stop. *See Rodriguez*, 575 U.S. at 355. The probation check was done at the same time, and did not prolong the stop. *See Evans*, 786 F.3d at 787 (ex-felon registration check problematic when done "*after*" traffic stop was completed (emphasis in original)).

The search of Crenshaw's person was also legal. Crenshaw does not dispute that he was on PRCS status at the time of the traffic stop. Officers may order passengers out of a lawfully stopped vehicle, *see Maryland v. Wilson*, 519 U.S. 408, 415 (1997), and Crenshaw's PRCS status provided an independent basis to search him. As the Court has determined, "an officer's advance knowledge of a search condition validates a subsequent warrantless search." *United States v. Miller*, No. 4:15-CR-00197-JD-1, 2016 WL 80565, at *2 (N.D. Cal. Jan. 7, 2016), *aff'd*, 694 F. App'x 609 (9th Cir. 2017) (unpublished). PRCS "provides for local post-incarceration supervision of less serious offenders by a county department rather than the state parole authorities," and every PRCS participant is "subject to search at any time of the day or night, with or without a warrant," of his person, residence, or possessions. *Id.* (quoting Cal. Penal Code § 3453(f)). The California Supreme Court treats a warrantless search condition as "tantamount to a suspicionless search condition." *Id.* (quoting *People v. Douglas*, 240 Cal. App. 4th 855, 864 n.7 (Cal. Ct. App. 2015)). California courts also treat "PRCS as comparable to parole rather than probation," which means that suspicionless searches of PRCS participants are permitted so long as they are "not conducted arbitrarily, capriciously or for harassment." *Id.* (citations omitted).

Crenshaw's search was well within these provisions. Officer Roberts knew about the search condition before he patted Crenshaw down, and knew that "people on PRCS are subject to searches by law enforcement." Dkt. No. 43 ¶ 7. Nothing in the record indicates that the search was arbitrary or harassing, or done for an improper purpose or in an improper manner. *See United States v. Cervantes*, 859 F.3d 1175, 1183 (9th Cir. 2017), *as amended* (Sept. 12, 2017).

That resolves all of Crenshaw's substantive challenges to the search and seizure. The Court's conclusions are based on the undisputed evidence in the record, which eliminated any need for an evidentiary hearing. *See United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000);

8

*United States v. Jackson*, No. 4:19-CR-00010-JD-1, 2020 WL 6047235, at *1 (N.D. Cal. Oct. 13, 2020).  The body camera footage largely eliminated material disputes about the events during the stop, and the parties did not identify any significant factual disagreements of import.  At oral argument and in a reply brief, Crenshaw's counsel suggested that Officer Alvarado might have asked the driver about his probation status while discussing the registration issue.  Counsel did not cite any solid evidence to that effect, and it appears to be entirely speculative.  Even assuming it happened, it would not change the conclusion that the stop was not improperly prolonged.

**IT IS SO ORDERED.**

Dated:  November 23, 2020

JAMES DONATO
United States District Judge